# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BOARD OF TRUSTEES OF IBEW LOCAL 100 PENSION TRUST FUND and JOINT ELECTRICAL INDUSTRY TRAINING TRUST FUND,**<br><br>**Plaintiffs**<br><br>**v.**<br><br>**MICHAEL CHARLES COLE d/b/a Michael Cole Electric, and DOES 1-50 inclusive,**<br><br>**Defendant** | CASE NO. 1:21-CV-0750 AWI EPG<br><br>ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. No. 26) |

This is an ERISA related dispute between Plaintiffs the Board of Trustees of IBEW Local 100 Pension Trust Fund ("Pension Fund") and the Joint Electrical Industry Training Trust Fund ("Training Fund") (collectively "Plaintiffs") and Defendant Michael Cole ("Cole") d/b/a Michael Cole Electric ("MCE"). Plaintiffs allege a breach of 29 U.S.C. § 1132(a)(3) for MCE's failure to comply with audits for the calendar years 2016, 2017, 2018, and 2019.[1] Currently before the Court is Plaintiffs' motion for partial summary judgment on the issue of whether MCE is bound by a collective bargaining agreement. For the reasons that follow, the Court will deny Plaintiffs' motion for summary judgment.

## **PARTIAL SUMMARY JUDGMENT FRAMEWORK**

Summary judgment is proper when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-

---

[1] Plaintiffs also allege a violation of 29 U.S.C. § 1145 regarding unpaid contributions if an audit of the above four years determines that MCE failed to remit all required fringe benefit contributions.

1  Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears
2  the initial burden of informing the court of the basis for its motion and of identifying the portions
3  of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine
4  issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty
5  Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome
6  of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49
7  (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009).  A dispute is "genuine" as to
8  a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-
9  moving party.  Anderson, 477 U.S. at 248; Karasek v. Regents of the Univ. of Cal., 956 F.3d
10 1093, 1104 (9th Cir. 2020).

11         Where the moving party will have the burden of proof on an issue at trial, the movant must
12 affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.
13 Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an
14 issue at trial, the movant may prevail by presenting evidence that negates an essential element of
15 the non-moving party's claim or by merely pointing out that there is an absence of evidence to
16 support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Herbert
17 Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984.  If a moving party
18 fails to carry its burden of production, then "the non-moving party has no obligation to produce
19 anything, even if the non-moving party would have the ultimate burden of persuasion at trial."
20 Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000).  If the
21 moving party meets its initial burden, the burden then shifts to the opposing party to establish that
22 a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith
23 Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot
24 "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence
25 that 'sets forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v.
26 Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

27         The opposing party's evidence is to be believed, and all justifiable inferences that may be
28 drawn from the facts placed before the court must be drawn in favor of the opposing party.  See

2

1 Anderson, 477 U.S. at 255; Yu v. Idaho State Univ., 15 F.4th 1236, 1242 (9th Cir. 2021).  While a
2 "justifiable inference" need not be the most likely or the most persuasive inference, a "justifiable
3 inference" must still be rational or reasonable.  See Narayan v. EGL, Inc., 616 F.3d 895, 899 (9th
4 Cir. 2010).  Summary judgment may not be granted "where divergent ultimate inferences may
5 reasonably be drawn from the undisputed facts."  Fresno Motors, LLC v. Mercedes Benz USA,
6 LLC, 771 F.3d 1119, 1125 (9th Cir. 2015).  Inferences are not drawn out of the air, and it is the
7 opposing party's obligation to produce a factual predicate from which the inference may be drawn.
8 See Pyramid Techs., Inc. v. Hartford Ins. Co., 752 F.3d 807, 818 (9th Cir. 2014); Sanders v. City
9 of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008).  "A genuine issue of material fact does not
10 spring into being simply because a litigant claims that one exists or promises to produce
11 admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002);
12 see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  The parties
13 have the obligation to particularly identify material facts, and the court is not required to scour the
14 record in search of a genuine disputed material fact.  Californians for Renewable Energy v. Cal.
15 PUC, 922 F.3d 929, 935-36 (9th Cir. 2019); Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th
16 Cir. 2010).  Further, a "motion for summary judgment may not be defeated . . . by evidence that is
17 'merely colorable' or 'is not significantly probative.'"  Anderson, 477 U.S. at 249-50; McIndoe v.
18 Huntington Ingalls, Inc., 817 F.3d 1170, 1173 (9th Cir. 2016).  If the nonmoving party fails to
19 produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled
20 to summary judgment.  Nissan Fire, 210 F.3d at 1103.  These standards apply to both motions for
21 full summary judgment and for partial summary judgment.  See Flores v. City of San Gabriel, 824
22 F.3d 890, 897 (9th Cir. 2016); Valentich v. United States, 194 F.Supp.3d 1033, 1035 (E.D. Cal.
23 2016).

**FACTUAL BACKGROUND[2]**

25     The Pension Trust and the Training Trust are multi-employer employee benefit plans that
26 are governed by ERISA.  PUMF 1.  Third parties East Central California Chapter National

---

[2] "PUMF" refers to Plaintiffs' Undisputed Material Fact, and "DRPUMF" refers to Defendant's Response to Plaintiffs' Undisputed Material Facts.

3

Electrical Contractors Association and Local Union #100 of the International Brotherhood of Electrical Workers ("Local 100") are parties to various collective bargaining agreements, which are entitled the Inside Wireman's Agreement ("IWA"); the IWA has consecutive effective time periods.  See PUMF 2.  Employers who wish to be bound to the IWA and receive the benefits offered from the IWA generally execute a Letter of Assent.  See PUMF 3.  The Letter of Assent provides that the employers shall be bound – and shall remain bound – until they provide the requisite notice to terminate the relationship.  PUMF 4.

The IWA requires, among other things, that bound employers[3] self-report the covered work performed by their employees and remit fringe benefit contributions for the work performed.  See PUMF 5.  These reports take the form of fringe benefit contribution reports, which must be submitted by the employers on a monthly basis.  See PUMF 6.  The contribution form contains the following certification ("the Certification") immediately above the employer's signature:

> The employer reporting herein recognizes that it is bound by the Restated Employee Benefit Agreement and Trust for the IBEW Local Union No. 100 Pension Trust Agreement, and the IBEW Local 100 Joint Electrical Industry Training Trust Fund Agreement (collectively, the 'Agreements').  The employer agrees to make the required contributions to these Trust Funds as provided therein, along with interest, liquidated damages, costs and attorneys' fees in the event that an audit discloses underreported or unreported hours.  The employer acknowledges having received a copy of the above Agreements.  The employer certifies, under penalty of perjury under the laws of the United States of America and the state of California, that the information contained in this report is a full and accurate statement of hours worked and wages earned of all employees subject to employer contributions pursuant to a collective bargaining agreement with Local 100, a subscription agreement or otherwise.  The employer further certifies that if contributions are made to any of the Trust Funds on behalf of non-bargaining unit employees, it is making such contributions in accordance with the Plan Documents for said Trust Funds.

PUMF 7.

The IWA offers benefits for bound employers.  See DUMF 8.  For example, IWA bound employers have access to a pool of trained and ready apprentices, journeymen, foremen, and other electrical professionals on short notice.  See DUMF's 8, 9, 10.  The IWA also provides bound

---

[3] DUMF 5 and other DUMF's do not use the phrase "bound employers," but instead refer to "signatory employers, and employers otherwise bound to the IWA."  E.g. DUMF's 5, 8, 10.  However, the Court can detect no difference between a "bound employer" and "signatory employers, and employers otherwise bound to the IWA," since signatories and those otherwise bound are both bound by the IWA.  Instead of using the cumbersome phrase "signatory employers, and employers otherwise bound to the IWA," the Court will use the phrase "bound employers."

4

employers with various fringe benefits to provide to employees, including death and health benefits. See DUMF 11. IWA bound employers are also eligible to attend periodic courses or training programs. See DUMF 12.

Cole Electric Repair Specialist ("CERS") was an electrical contractor licensed by the California Contractors State License Board ("CSLB") that had a classification for C-10 electrical work and had a Federal Employer Identification Number 77-0404034. See DUMF 13. CERS was issued a contractor's license on December 22, 1997. DUMF 14. CERS was a partnership between Cole and a third party. DUMF 15. CSLB records list Cole as the qualifying partner of CERS, and Cole represented himself as the owner of CERS. See DUMF 16. CERS utilized a business address of P.O. Box 1302 in Clovis and had a business telephone number ending in 6464. See DUMF 17.

On June 18, 2002, Cole as a partner of CERS signed a Letter of Assent that bound CERS to the then-operative IWA (June 1, 2000 to May 31, 2003). See DUMF 18; PRDUMF 18. The Letter of Assent in part stated that CERS agreed to comply with and be bound by all the provisions of the current IWA and subsequently approved IWA's and that the Letter of Assent would remain in effect until CERS gave written notice at least 150 days prior to "the anniversary date of the then approved [IWA]." See DUMF 19. As relevant here, various IWA's were approved from June 1, 2003 through May 31, 2021. See DUMF 20.

CERS ceased conducting business on September 19, 2006. DUMF 21. CERS's contractor's license also expired on September 19, 2006. See DUMF 22. All of CERS's employees were laid off. See Cole Dec. ¶ 13. There is no record of CERS submitting a notice to withdraw from any IWA, and Cole has no recollection of submitting a written notice of withdrawal. See DUMF 23; PRDUMF 23. However, Cole called Local 100 and informed Local 100 that CERS would no longer be in business. See Cole Dec. ¶ 10. No contributions or reports pursuant to the IWA were submitted by CERS after September 2006 because CERS did no business. See id. Since September 19, 2006, CERS has conducted no business. See Cole Dec. ¶ 6.

Cole conducted business as MCE from July 1, 1999 through October 12, 2001, and from

5

1  February 17, 2006 through the present. DUMF 25. After CERS went out of business, Cole began
2  working at MCE as the sole proprietor. See Cole Dec. ¶ 11; PRDUMF 40. Since CERS went out
3  of business, MCE is the only way by which Cole has conducted business. See DUMF 30. Cole is
4  licensed by the CSLB for C-10 electrical work and has his own Federal Employer Identification
5  Number (11-3770519). See DUMF 24. Cole/MCE has the same business address (P.O. Box
6  1302) and business telephone ("the 6464 number") as CERS. See DUMF 26. Prior to the creation
7  of CERS, P.O. Box 1302 and the 6464 telephone number belonged to Cole. See Cole Dec. ¶ 8.
8  Because Cole was a partner in CERS, it was a convenience to use the address and telephone
9  number while CERS was in existence. See id. Cole/MCE did not use or hire any former
10 employees from CERS. See id. at 13. From 2006 through 2015, Cole did not use any union labor
11 or sign a letter of assent because he could not afford to do so. See id. at ¶¶ 12-13. During this
12 time period, Cole paid nothing to Local 100 or Plaintiffs. See id. at 11.

13       In early 2016, Cole began to work on public projects again and hired apprentices and other
14 union worker at various times in 2016, 2017, 2018, and 2019. See id. at ¶ 14; DUMF 27. Cole
15 understood California law to require contractors to contact labor organizations to obtain
16 apprentices for public projects. See Cole Dec. ¶ 15. Cole made requests to Local 100 for
17 apprentices and other union employees on an as needed basis, depending on what projects were
18 underway. See id. At times, Local 100 informed Cole that no apprentices or other workers were
19 available and he did not receive requested workers. See id. at ¶ 16. However, Cole did receive
20 union employees at times. See DUMF 27; ¶ 14. For 2016 and 2017, union workers comprised
21 about 10% of Cole's payroll, and for 2018 and 2019 at most up to 50% of the payroll from time to
22 time. See Cole Dec. ¶ 14. The bulk of Cole/MCE's projects are not public projects and the bulk
23 of Cole's employees are not union members. See id. at ¶¶ 14, 15, 20.

24       Cole/MCE has not signed a letter of assent. See Cole Dec. ¶¶ 4, 12. Further, when he
25 contacted Local 100 and asked for an apprentice, Local 100 did not tell Cole that Local 100 would
26 then consider Cole to be a signatory to the IWA. See id. at ¶ 17. However, Cole did understand
27 that if he used an apprentice from Local 100, then he would need to submit the payroll information
28 for the apprentice and make the contributions required by "the agreement" and California law.

See id. Cole declares that he was agreeing to pay various amounts mandated by an agreement, and that he was not agreeing to be a signatory of the agreement by simply paying the mandated amounts. See id. Whenever an apprentice worked for Cole/MCE, he paid what "the agreements" required and filled out a report on the form provided by Local 100. See Cole Dec. ¶ 18. All payments were made using Cole/MEC's employer identification number, not CERS's number, and were made on checks from MEC. See id. at ¶ 19; see also PUMF's 31, 33. Each report that Cole/MCE submitted to Local 100 contained the Certification. See PUMF's 7, 55, 56; Moore Dec. Exs. K-XXX; see also PUMF 34. Further, Cole/MCE submitted reports to Local 100 almost every month during 2016, 2017, 2018, and 2019, even when no apprentices/union workers were used (such forms contained nothing but zeroes and identified no union workers). See Moore Dec. Exs. K-XXX; see also PUMF's 37, 45. Cole declares that the amounts to be paid came from agreements and that he was agreeing to pay those amounts, but he was not agreeing to be a signatory to any agreements simply by paying the required amounts. See Cole Dec. ¶ 17. Cole did not inform Plaintiffs or Local 100 that he did not consider himself to be covered by the IWA prior to Plaintiffs' attempt to audit him for the years 2016 through 2019. See DUMF 36.

## PLAINTIFFS' MOTION

*Plaintiffs' Arguments*

Plaintiffs argue that they are entitled to partial summary judgment on two grounds.

First, Cole/MCE is the successor of CERS because both share the "Cole Electric" portion of their name, have C-10 electrical licenses, share the same business address and phone number, both have Cole in an ownership capacity, and both pulled electrical professionals from Local 100 (which is a benefit that is available only to IWA bound employers). Further Cole never withdrew CERS from the IWA for the four years at issue herein. Instead, Cole continued to submit fringe benefit reports and contributions almost all the months in the relevant four years, even for months in which he indicated that he used no unionized labor. Cole/MCE's consistent pattern of conduct conformed to the IWA and shows an intent to be bound by the IWA as CERS's successor, which makes the absence of a letter of assent from Cole on behalf of MCE irrelevant.

7

1      Second, even if MCE is not CERS's successor, Cole is still bound by the IWA through the
2 Certification in the contribution reports.  An employer need not sign a collective bargaining
3 agreement or a letter of assent in order to be bound to a collective bargaining agreement.  An
4 execution by the employer of another writing may be sufficient.  Courts have found that
5 certifications that reference collective bargaining agreements, like those submitted by Cole for
6 nearly 48 months, can be sufficient to bind an employer to a collective bargaining agreement.

7      In reply, Plaintiffs argue that California law only requires a contractor on public projects to
8 contact organizations like Local 100, but it does not obligate the organization to actually supply
9 apprentices.  Regulatory provisions provide exemptions where apprentices are unavailable.  Cole
10 could have utilized the exemptions and suffered labor shortages like non-signatory employers, but
11 instead he acted as a signatory employer and was dispatched apprentices.  Moreover, Cole admits
12 that he was dispatched non-apprentice union workers from Local 100, including construction
13 engineers and construction wiremen who work on private projects only, even though California
14 law did not require him to do so.  Only employers bound by the IWA can call for these workers
15 from Local 100.  Additionally, Plaintiffs emphasize that Cole/MCE submitted fringe benefit
16 reports with the certification for 44 months out of a 48 month period (no reports were filed from
17 December 2017 through March 2018), even when zero hours were reported.  This conduct does
18 not support an assertion that union workers were utilized for random "one off" projects.

19   *Defendant's Opposition*

20      Cole argues that the evidence does not show that MCE is the successor of CERS.  All
21 CERS employees were laid off and none worked for Cole/MCE, CERS and MCE have different
22 employer identification numbers and different electrical licenses, and there is no evidence that any
23 assets of CERS went to Cole.  There is a shared address and phone number, but those were owned
24 by Cole prior to forming CERS.  Further, there is no evidence that Cole/MCE acted as if it were
25 bound by agreements signed by CERS because Cole/MCE did not use any union labor until 2016.

26      Cole also argues that there is no written agreement between himself and Plaintiffs or Local
27 100 with respect to adoption of the IWA.  Unlike the cases relied on by Plaintiffs, Cole never
28 signed a letter of assent, a collective bargaining agreement, or a correspondence that admitted to

8

being bound by a collective bargaining agreement. The contribution reports signed by Cole logically mean that the submitter agrees to pay the amounts set by the agreements for covered employees' work; it is not a broad statement that says something to the effect that by submitting the report, the employer essentially signed a letter of assent and is bound until certain notice is given. Making payments into the benefit plan is not itself a written agreement and does not bind a party making the payments. Cole argues that he requested apprentices because he was obligated to do so under state law, and Local 100 did not tell him that, by utilizing unionized labor, he would essentially be agreeing to a letter of assent. Finally, Cole argues that there was no meeting of the minds as to the contribution reports, nor was there a mutuality of obligation. Cole contends that he did not intend to be fully bound by the IWA and that he did not get access to workers whenever he needed them and thus, got zero benefits.

*Discussion*

1. MCE as Successor to CERS

A company will be deemed a "successor" if it "hires most of its employees from the predecessor employer's work force and if it conducts essentially the same business as the predecessor." Trustees for Alaska Laborers-Construction Indus. Health & Sec. Fund v. Ferrell, 812 F.2d 512, 515 (9th Cir. 1987); see Kallmann v. NLRB, 640 F.2d 1094, 1100 (9th Cir. 1981). Although a successor employer is bound to recognize and bargain with a union with whom its predecessor had a contract, the successor employer is not bound by the substantive provisions of collective bargaining agreement negotiated by its predecessor, but not agreed to or assumed by it. Audit Services, Inc. v. Rolfson, 641 F.2d 757, 763 (9th Cir. 1981); see also NLRB v. Advanced Stretchforming Int'l, Inc., 233 F.3d 1176, 1180 (9th Cir. 2000); Carpenters S. Cal. Admin. Corp. v. Russell, 726 F.2d 1410, 1413 n.3 (9th Cir. 1984); NLRB v. World Evangelism, Inc., 656 F.2d 1349, 1355 (9th Cir. 1981). A successor may assume or agree to a collective bargaining agreement through the receipt of benefits from the bargaining agreement and continued acts consistent with the bargaining agreement. See Rolfson, 641 F.2d at 763-64. Whether an entity is a successor is a fact intensive inquiry that depends upon the facts and legal context of each case. See Sullivan v. Dollar Tree Stores, Inc., 623 F.3d 770, 782 (9th Cir. 2010); Rolfson, 641 F.2d at 764.

Here, the evidence does not demonstrate that Cole/MCE is the successor of CERS. Critically, to the extent that Cole as a partner of CERS and the sole proprietor owner of MCE can be classified as an "employee," he would be the only employee common to both CERS and MCE. There is no evidence to contradict Cole's assertion that all CERS employees were laid off in September 2006, and that none of those employees were hired by Cole/MCE. See Cole Dec. ¶ 13. This fact alone is dispositive and precludes a finding that Cole/MCE is the successor CERS. See World Evangelism, 651 F.2d at 1354; Rolfson, 641 F.2d at 763; Kallmann, 640 F.2d at 1100.

Nevertheless, apart from absence of a shared labor force, Cole/MCE and CERS have different numbered electrical licenses and employer identification numbers, and while Cole on behalf of CERS signed a letter of assent and engaged in public projects, see DUMF 18, Cole/MERS has never signed a letter of assent and did not work on public projects for about the first nine years after CERS ceased to exist. See Cole Dec. ¶ 11. In those nine years, Cole was dealing with a bankruptcy and attempting to build up the business of MCE. See id. Thus, the scope of the work performed by CERS and MCE for the first nine years of MCE's existence and CERS's demise appear to be materially different from scope of the work performed by CERS. Further, there is no indication that any equipment belonging to CERS was utilized by MCE.

It is true that MCE and CERS have part of "Cole Electric" in their name, have Michael Cole as an owner, and share a PO Box business address and a telephone number. However, Cole has explained that the PO Box and telephone number belonged to him before CERS was formed and the use of those resources was a mere convenience. See id. at ¶ 8. Given this uncontradicted assertion, it is hardly surprising that these resources would revert back to Cole as he attempted to build up MCE. Moreover, these resources are also very modest and not permanent. New telephone numbers and new PO Boxes are easily attainable. Further, "Cole Electric Repair Services" is a different name than "Michael Cole Electric." That Cole as an electrician left a failed partnership and began another electrical business while still using part of his name (in some form) in his sole proprietorship is not surprising. A partially shared (though different) name and two shared modest (at best) assets are clearly not enough to support a finding of successorship, particularly in the face of the other weighty factors that demonstrate distinctness.

In sum, while successorship is normally a very fact bound inquiry, the evidence presented demonstrates that Cole/MCE is not the successor of CERS.[4]  Cf. Rolfson, 641 F.2d at 763-64 (recognizing the fact and context intensive nature of a successorship inquiry, yet holding that an employer was a successor of the prior employer).  As such, summary judgment in favor of Plaintiffs on any theory that requires Cole/MCE to be the successor of CERS is inappropriate.  See id.

### 2. Conduct of Cole/MCE

It has long been understood that a "union and employer's adoption of a labor contract is not dependent on the reduction to writing of their intent to be bound."  NLRB v. Haberman Constr. Co., 641 F.2d 351, 355-56 (5th Cir. 1981).  Without signing a collective bargaining agreement, an employer can adopt the terms of an unsigned collective bargaining agreement "by embarking on a course of conduct evincing an intention to be bound."  Hawaii Carpenters Tr. Funds v. Waiola Carpenter Shop, Inc., 823 F.2d 289, 295 n.8 (9th Cir. 1987); see Southern Cal. Painters & Allied Trade Dist. Council No. 36 v. Best Interiors, Inc., 359 F.3d 1127, 1131-33 (9th Cir. 2004); Haberman Constr., 641 F.2d at 355-56.  Thus, the relevant inquiry for adoption by conduct is whether the employer has engaged in "conduct manifesting an intention to abide by the terms of the agreement."  Southern Cal. Painters, 359 F.3d at 1133; Haberman Constr., 641 F.2d at 356.  Courts have considered a number of non-exclusive factors in evaluating adoption by conduct, including:  (1) the payment of union scale wages or varying wages, (2) the remission of union dues, (3) the payment of fringe benefit contributions, (4) the existence of other agreements or other writings that evidence assent, (5) the submission to union jurisdiction, such as a grievance procedure, (6) the voluntary submission to a union audit, and (7) whether non-union workers, in addition to union workers, were hired to perform work covered by a collective bargaining agreement.  See Bricklayers Local 21 of Ill. Apprenticeship & Training Prgm. v. Banner

---

[4] The Court also notes that for about nine years, Cole/MCE did nothing that would appear to be consistent with or required by any agreements or letters of assent between Local 100 and CERS.  The evidence presented demonstrates that CERS is an utterly defunct and non-existent operation, and has been since September 19, 2006.  Given the apparent nature of the dissolution of CERS, that written notice by anyone at CERS was not sent to Local 100 appears to be an immaterial fact.

11

Restoration, Inc., 385 F.3d 761, 766 (7th Cir. 2004); Fiorentino v. Bricklayers & Allied Craftworkers Local 4 Pension Plan, 2016 U.S. Dist. LEXIS 135657, *54-*55 (D.N.J. Sep. 30, 2016). Additionally, a boilerplate attestation or certification on a remittance form can also constitute "some weight" in determining whether a non-signatory employer has adopted a collective bargaining agreement by conduct. See New Jersey Reg'l Council of Carpenters v. Jayeff Constr. Corp., 495 F. App'x 230, 234 (3d Cir. 2012); Banner Restoration, 385 F.3d at 767 n.3. However, courts generally refuse to find that a non-signatory employer is bound to a collective bargaining agreement based only on a certification in a remittance report. See New Jersey Reg'l, 495 F. App'x at 234; Firesheets v. A.G. Bldg. Specialists, 134 F.3d 729, 731 (5th Cir. 1998).

Here, there appear to be no general disputes for the four basic actions by Cole that are identified by Plaintiffs. That is, there is no dispute that Cole/MCE has requested Local 100 to send union employees for certain jobs, and these employees were not limited to merely apprentices;[5] Cole/MCE paid union employees sent by Local 100 union scaled wages and made appropriate contributions for those employees to the Trust Funds; Cole submitted a number of contribution payroll forms, even when no employees or hours were identified; and each contribution report contained the Certification and was signed by Cole or an employee of MCE. This conduct can be viewed as consistent with an intent to be bound by the IWA.

However, other consideration lessen the impact of some of the above evidence. First, although it is Local 100's position that only employers bound to the IWA are permitted to request and to receive union employees, there is no evidence that this was known to Cole/MCE. There is no evidence that anyone from Local 100 actually told Cole/MCE (either orally or in writing) that only employers bound to the IWA could request and receive its workers. Moreover, there is nothing about the contribution form that informs employers that only IWA bound employers can utilize Local 100 employees/members. It is not necessarily unreasonable to believe that one can utilize union labor in exchange for paying union wages and benefits.

---

[5] The Court credits Cole's declaration that there were times in which Local 100 did not send him requested workers. However, there were clearly times that Local 100 did so. The fact that they sent him some workers is a benefit to Cole, even if Local 100 could not always and immediately meet Cole's staffing needs.

Second, Cole has declared that the bulk of his work force is non-union and union salaries often made up about 10% of wages, though occasionally 50%. This evidence indicates a work force that was largely non-union and that was sometimes supplemented by union employees. Thus, while Local 100 members were utilized and apparently requested by Cole, it does not appear they were utilized in consistently large or significant numbers.

Finally, in 2016, 2017, 2018, and 2019, either Cole or members of his staff signed about 44 contributions reports. These contribution reports are actually entitled "Calculation Form, Monthly Payroll Report for Members of IBEW Local Union No. 100." The contribution reports all include the Certification quoted above. Significantly, the Court agrees with Cole that the language appears primarily aimed at ensuring that all Local 100 employees' hours and owed fringe benefits are reported correctly and paid. The Certification expressly mentions only the two Trust Fund Agreements and obligates the employer to make the payments required by these two Agreements.[6] The Certification does not identify the IWA, or any particular collective bargaining agreement, nor does the Certification state that the signatory is bound to the IWA as if he were a signatory to the IWA or to a formal letter of assent. There is nothing about the Certification that clearly shows that a signatory will become a signatory to the entire IWA simply by filling out and signing the payroll calculation form. Plaintiffs appear to argue that the IWA is incorporated by reference in the various Trust Fund Agreements. This may be so, but the IWA is not explicitly identified in any document signed by Cole. Plaintiffs cite no authority in which multiple layers of incorporation by reference was found to automatically bind a party such as Cole, particularly when the document being signed does not actually identify the binding document. There is nothing about the language of the Certification that clearly takes it out of the general rule – by itself, the Certification does not bind Cole/MCE to the IWA. See New Jersey Reg'l, 495 F. App'x at 234; Firesheets, 134 F.3d at 731.

---

[6] Plaintiffs' briefing at times states that the Certification expressly identifies the Trust Agreements and the IWA. This is false. The closest that the Certification comes to identifying the IWA is having the employer certify that the contribution report is a full and accurate statement of the hours and wages of all employees who may be subject to contributions from "a collective bargaining agreement with [Local 100], a subscription agreement or otherwise." Merely stating that an employee is subject to one of three types of possible agreements is hardly the same as expressly referencing the IWA or clearly showing that an employer such as Cole/MCE will be fully bound by the IWA. Therefore, contrary to Plaintiffs' briefing, the Certification does not expressly identify or reference the IWA.

In addition, other aspects of the evidence indicate that Cole/MCE is not bound by the IWA. From the contribution reports submitted and Cole's declaration, it is apparent that Cole/MCE employs both union and non-union employees, but the bulk of his employees are non-union. There is no indication of how Cole utilizes his work force, but given that there are relatively few employees listed on the contribution reports, the Court is willing to assume that Cole utilizes both union and non-union employees on the same job. See Yu, 15 F.4th at 1242 (all justifiable inferences are made in the non-moving party's favor). Similarly, because Cole declares that the bulk of his workforce is non-union and that union workers do not make up more than 50% of his payroll, the Court finds that it is reasonable at this time to infer that Cole/MCE pays non-union scale wages to his non-union employees. See id. There is no evidence that Cole/MCE has ever submitted to any IWA or Local 100 grievance type procedure, and this lawsuit clearly demonstrates that Cole has not submitted to any audits by Local 100. Further, there are no letters of assent that have been signed by Cole/MCE, Cole/MCE is not a signatory to the IWA, no one at Local 100 told Cole that he would be bound to the IWA if he requested and received union employees, and no agreements or representations by Cole/MCE that state that Cole/MCE is bound as/like a signatory to the IWA have been produced. In fact, Cole has declared that he does not believe that he is bound by the IWA. Finally, there is no evidence that Cole/MCE generally follows or conducts his business in accordance with any directives, guidelines, or obligations contained within the IWA.

In sum, there are a number of considerations that weigh against a finding that Cole/MCE is bound by the IWA. Viewing the evidence in the light most favorable to Cole as the non-moving party, the Court cannot hold that Cole/MCE's conduct shows as a matter of law that Cole/MCE has adopted the IWA or is otherwise bound by the IWA.[7] Summary judgment in favor of Plaintiffs on this theory is inappropriate.

---

[7] Relying on 29 U.S.C. § 186, Plaintiffs contend that finding Cole is not bound by the IWA could cause the Local 100 members to lose service credit for their time working for Cole. However, a collective bargaining agreement is not necessary to comply with § 186, rather, a written agreement is necessary (such as a trust agreement). Guthart v. White, 263 F.3d 1099, 1103-04 (9th Cir. 2001). Further, the issue before the Court is not about the service hours for the Local 100 members who worked for Cole, the issue before the Court is whether Cole is bound by the IWA.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that Plaintiffs' motion for summary judgment (Doc. No. 26) is DENIED.

IT IS SO ORDERED.

Dated:   November 22, 2022                         _____
                                                                    SENIOR  DISTRICT  JUDGE